MURRELL J. BRANNAN v. ELMER J. SHERTZER.
MABEL C. CLARK v. SAME.[1]

May 28, 1954.

Nos. 36,190, 36,191.

[1]Reported in 64 N. W. (2d) 755.

*Samuel Saliterman,* for appellants.

*Vernon J. Schweiger,* for respondent.

KNUTSON, JUSTICE.

Plaintiffs, Murrel J. Brannan and Mabel C. Clark, appeal from separate orders denying their motions for new trials in two negligence actions which were consolidated for trial.

On the evening of July 7, 1951, Brannan was driving Mrs. Clark's automobile in a southerly direction on Nicollet avenue in Minneapolis. She was riding with him in the front seat. At the intersection of said avenue and Eleventh street, Brannan brought the automobile to a complete stop in obedience to a traffic light located at the intersection. While waiting for the signal to change to "go" the automobile was struck from the rear by an automobile owned and operated by the defendant. Both plaintiffs commenced actions for personal injuries, and Mrs. Clark also sought recovery for the damage to her automobile. Liability was admitted by the defendant, and there was a verdict for Mrs. Clark for $793 and one for Brannan for $5,850. The Brannan verdict was increased by the trial court to $7,500, to which increase the defendant consented.

The assignments of error present three questions: (1) Did the court abuse its discretion in denying plaintiffs' motions for leave to file amended complaints charging the defendant with wilful and wanton negligence? (2) Was it error to deny Mrs. Clark's motion for a new trial made upon the ground that the verdict was inadequate? (3) Was it error to deny a similar motion made by Brannan?

The original complaint in each action charged the defendant with simple negligence in the operation of his automobile. In the Clark action defendant answered denying his negligence and alleging that the collision occurred solely because of the negligence of Brannan. In the Brannan action defendant's answer denied his negligence and alleged that the collision occurred because of Brannan's negligence and contributory negligence.

Thereafter both plaintiffs moved the court for an order granting them the right to amend their complaints so as to charge the defendant with wilful and wanton negligence and based their motions upon their own affidavits submitted with the motions. These affidavits stated that the Clark automobile had been brought to a complete "standstill" at the intersection in obedience to a stop light; that after standing there several seconds it was struck a heavy blow from the rear by defendant's automobile; that defendant was intoxicated at the time and "made certain statements to your affiant [Brannan], and from these statements, affiant [Brannan] believes that the acts of negligence committed by the defendant were wilful, wanton and unlawful, and that defendant could have avoided hitting plaintiff's automobile at that time." Defendant's attorney, in opposing the motions, submitted his own affidavit in which he stated that defendant had informed him that he was not intoxicated at the time, and he also stated that he believed that the purpose of the proposed amendment was to bring prejudicial matters before the jury in an effort to sway it emotionally and thus recover high verdicts. He asserted the belief that plaintiffs' attorney was well aware that there was no element of wilful and wanton negligence involved, that facts previously brought out in depositions clearly showed that defendant was not aware of plaintiffs' peril in time to prevent a collision, and that defendant did not fail to exercise care after discovering that any person was in peril. The affidavit further stated that the proposed amendments to the complaints were sham and frivolous and that the affidavits of plaintiffs submitted in support of their motions failed to show any facts justifying the motions or their allowance. The motions were denied but plaintiffs were granted the right to renew the same at the commencement of the trial.

Subsequently defendant, in the Clark case, moved the court for leave to make Brannan a party to the action and to be permitted to serve a third-party complaint upon him. The motion was granted and the complaint served, to which an answer was interposed alleging that defendant was guilty of wilful and wanton negligence. At a pretrial conference held before another judge on April 22, 1953,

defendant admitted liability and with the approval of the court dismissed his third-party complaint, thus eliminating the issue of wilful and wanton negligence from the pleadings. At the same pretrial conference plaintiffs again moved the court for the right to amend their complaints so as to charge the defendant with wilful and wanton negligence for the same reasons given by them in support of their original motions. The motions were denied.

When the trial commenced on May 11, 1953, before still another judge, plaintiffs again moved for the right to amend their complaints so as to set forth the claim of wilful and wanton negligence. The court was advised that the purpose of the offer was to secure an adjudication which would prevent the defendant from discharging his liability to the plaintiffs in bankruptcy should there be a verdict in their favor for more than the amount of insurance carried upon defendant's automobile. The motion was again denied and the cases proceeded to trial upon the issue of damages only. It appears without dispute that the verdicts are for less than the amount of insurance coverage.

Wilful and wanton negligence as defined by this court is a reckless disregard of the safety of the person or property of another by failing *after and not before* discovering the peril to exercise ordinary care to prevent the impending injury. Hinkle v. Minneapolis, A. & C. R. Ry. Co. 162 Minn. 112, 202 N. W. 340, 41 A. L. R. 1377; Turenne v. Smith, 215 Minn. 64, 9 N. W. (2d) 409; Hardware Mut. Cas. Co. v. Danberry, 234 Minn. 391, 48 N. W. (2d) 567; Bryant v. N. P. Ry. Co. 221 Minn. 577, 23 N. W. (2d) 174; 13 Dunnell, Dig. (3 ed.) § 7036. Plaintiffs, in their affidavits filed in support of their motions for permission to amend, set forth no facts to show that defendant failed, after discovering the peril, to exercise ordinary care to prevent the impending injury. True, Brannan stated in his affidavit that defendant "made certain statements" to him which led him to believe that defendant's acts of negligence were wilful and wanton, but this was his conclusion which had the facts been stated, the court might well have concluded otherwise.

Rule 15.01 of the Rules of Civil Procedure provides that a party, after a responsive pleading has been served, may amend his pleading only by leave of court or by written consent of the adverse party. It further provides that leave shall be freely granted when justice so requires. Such a motion to amend is addressed to the sound discretion of the court. The rule is identical with Rule 15(a) of the Federal Rules of Civil Procedure. The federal rule has been interpreted as vesting large discretionary powers in the trial court. United States v. A. H. Fischer Lbr. Co. (4 Cir.) 162 F. (2d) 872; Lorentz v. R. K. O. Radio Pictures (9 Cir.) 155 F. (2d) 84; Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co. (8 Cir.) 146 F. (2d) 165; Armstrong Cork Co. v. Patterson-Sargent Co. (N. D. Ohio) 10 F. R. D. 534. The rules of civil procedure make no substantial change in the allowance of amendments of pleadings. 1 Youngquist & Blacik, Minnesota Rules Practice, p. 476. Under prior practice, this court held that the amendment of pleadings was a matter lying almost wholly in the discretion of the trial court and that its action would not be reversed on appeal except for a clear abuse of discretion. 5 Dunnell, Dig. & Supp. § 7696.

Upon the showing made by plaintiffs in support of their motions we cannot say that the court abused its discretion in denying the motions. We think it could fairly and reasonably be inferred by the court that the real purpose behind the proposed amendments was not that the plaintiffs hoped to be able to establish defendant's wilful and wanton negligence but rather that they wished to get before the jury their claim of defendant's intoxication in the hope that by so doing the jury would return higher verdicts than otherwise.

Mrs. Clark claims that the verdict of $793 was so inadequate as to make it clearly appear that it was rendered under the influence of passion or prejudice. At the time of the trial she was 58 years of age. She was a seamstress and dress designer. She lived in her own duplex in Minneapolis. The accident occurred on Saturday night, July 7, 1951. Apparently she struck her head on the window post of the car. She was taken to the Minneapolis General Hospital

where she was examined by Dr. Voight. The hospital record shows that there was no unconsciousness but some "light-headedness." She had a "two centimeter hematoma in the right occipital region." The skin was intact and the neurological examination made at the hospital was negative. She was released from the hospital that same night and returned to her home. On the following Monday she consulted her family physician, Dr. C. M. Larson. He gave her a sedative and she returned home. Neither Dr. Voight nor Dr. Larson was called by her as a witness at the trial.

Mrs. Clark claims that because of the injuries received she was unable to concentrate on her work; that she frequently cried, was nervous, stuttered, had severe headaches; that her eyes bothered her so much that she thought she was losing her sight; that she was unable to sleep or relax and did very little work from the date of the accident until April 1952. She said that she worked intermittently from April until September 1952.

On October 1, 1951, Mrs. Clark was examined by Dr. Robert W. Cranston, a neurologist. She was given a complete examination which at one time included an encephalogram. This was essentially negative. In her history she stated to him that she had headaches, nervousness, was unable to focus her eyes and that she had "passed out." She was given a mild sedative. On October 10 she again saw Dr. Cranston at which time she told him that she had experienced another "black-out spell" stating that she had fallen to the floor and lost consciousness. She was referred by Dr. Cranston to Dr. Robert C. Challman, a psychologist, a doctor of philosophy, not of medicine. He gave her a series of intelligence, memory, abstract perception, drawing, and kindred tests. He testified that she had some impairment of memory and also impairment in the field of abstract perception. He stated that the findings which he obtained were consistent with the diagnosis of organic brain damage. On October 22 Dr. Cranston again examined her. She complained of headaches, inability to perform her work, and lack of confidence in herself. He diagnosed her condition as "post trauma syndrome, with considerable depression * * * affecting her personality very mark-

edly." Upon his recommendation she entered the Glenwood Hills Hospital on December 30 and was given a series of 12 electric shock treatments. She was discharged from the hospital on February 2, 1952. Dr. Cranston expressed the opinion that she had suffered a concussion of the brain with damage to the brain cells and stated that in his opinion the headaches, dizziness, fatigue, depression, lack of confidence, and loss of memory, of which she complained, were caused by the blow on the head which she received in the accident. He estimated that she was then 40 percent disabled and gave the opinion that she would have a permanent disability of between 25 to 35 percent and that she would never be as skillful, capable, and efficient a woman as she was before the accident; also that her deficiency in memory and her tenseness and nervousness would continue for the rest of her life.

Mrs. Clark claimed that before the accident she was well and had experienced none of the ailments described and that she was accustomed to work long hours each day without difficulty in her business as a seamstress and dress designer. Her hospital and doctor bills totaled $1,111.75 and there was evidence that the damage to her automobile was $200. If she was suffering from the symptoms and ailments outlined and if they were the result of the accident of July 7, the verdict, of course, was grossly inadequate and her motion for a new trial should have been granted. There was, however, evidence in the case which tended to impeach her credibility and to cast doubt upon the seriousness and extent of the injuries which she received in the accident. Neither doctor who testified for the plaintiff at the trial attended her at the time of the accident nor did they examine her until some months after it occurred. Their opinions were, in a substantial measure, based upon history given to them by her and her statements to them that prior to the accident she had none of the symptoms or ailments which we have enumerated. The defendant introduced evidence that Mrs. Clark, prior to the accident, was a nervous person; that she had an impediment in her speech; was subject to crying spells and was, at times, irritable and at other times depressed. And in a verified complaint which

she filed in an unlawful detainer action in the municipal court of Minneapolis prior to the accident she alleged that because of the actions of a tenant she had become ill in mind and body, was required to have medical care, and had twice collapsed and become hysterical. In her cross-examination evidence was elicited, which need not be summarized here, which tended to impeach her credibility.

The trial judge, who had the benefit of listening to the evidence, observing the witnesses, and considering the weight to be attached to their testimony, in his memorandum denying Mrs. Clark's motion for a new trial stated:

"The testimony in this case produced the simple fact issue for the jury as to what injuries, if any, the plaintiff had received as a result of the accident. The plaintiff introduced certain testimony of doctors, containing their opinions as to the condition of the plaintiff and the causal relationship of the same. These opinions were based upon the assumption that the plaintiff had never suffered, prior to the accident, the complaints and conditions told by her to the doctors and testified to in court as having been caused solely by the accident. The defendants introduced testimony at the trial that the complaints and conditions of the plaintiff which she had told her doctors and testified to in court as having been caused by the accident had existed for a long period of time prior to the accident and that the plaintiff was not truthful in her testimony.

"Testimony was ample and sufficient to allow the jury to find that the plaintiff had not adhered to the true facts, and the complaints and conditions which she testified to and told her doctors had not existed before the accident had actually existed before the accident and she did not sustain the injuries she complained of as a result of the accident."

After a careful examination of the evidence we conclude that it was within the province of the jury to find that, except for minor injuries received by Mrs. Clark in the accident of July 7 for which a verdict of $793 was adequate compensation, including damage to the car, her symptoms and ailments antedated the accident and were in no way related to it. Upon the record before us we would

not be justified in holding that the trial court abused its discretion in denying her a new trial.

■ Brannan claims that the verdict, as increased by the court, is still so inadequate as to require the granting of a new trial. He claims that for about a minute following the accident he did not know just what happened. He also was taken to the General Hospital but was released and returned home that same night. He testified that that night he suffered pain in the back of his head, neck, and shoulders and had difficulty in sleeping. On the second day following the accident he was examined by Dr. S. J. Raetz of Maple Lake who sent him to the St. Cloud hospital for X rays and heat treatment. He continued under the care of Dr. Raetz for about two months. He said that at first there was pain and numbness in his right arm but that later this entirely cleared up and that the pain and numbness then worked over into his left arm; also that he was suffering from pain and numbness in his left leg which interfered with his walking. He was referred by Dr. Raetz to Dr. H. B. Hannah, a neurologist of Minneapolis, who made an examination but prescribed no treatment. It is significant, in view of the record here, that neither Dr. Raetz nor Dr. Hannah were called as witnesses for Brannan at the trial.

On August 6, 1951, Brannan was examined by Dr. Carlton Kent Olson, a neurological surgeon of Minneapolis. Dr. Olson testified that he found a diminution of the reflexes of Brannan's right arm as compared to the left, numbness in the right hand, limitation of motion in the neck, and irritation of the sixth and seventh nerves which radiate out from the spinal column in the area of the neck. He recommended head-suspension treatment to be applied by the patient himself. He testified that in an examination on August 24 he found that the right arm was improving and then for the first time discovered numbness in the left hand. The self-applied head-suspension treatment continued and the doctor recommended that a steel and leather collar be worn between treatments. The doctor expressed the opinion that Brannan received a "whiplash neck injury" in the accident causing the symptoms of which Brannan complained. Treatment continued under the supervision of Dr. Olson

until September 28, 1952, at which time Brannan was sent to the Swedish Hospital where the doctor performed a laminectomy. Dr. Olson testified that during the course of the operation he found that the sixth cervical nerve was smaller than the surrounding nerves due to pressure from scar tissue and also that the nerves above and below the sixth were decompressed. Brannan developed an acute thrombophlebitis of one leg as a result of the operation from which he recovered. Otherwise there was a normal healing process.

The doctor testified that as permanent injuries Brannan would suffer pain in the neck region on very heavy lifting or straining and in lifting or straining of a moderate degree in odd positions, also weakness in the left arm in lifting, extension, and grip as well as numbness of the first, second, and third fingers of the left hand. He expressed the opinion that Brannan could not do the heavier type of mechanical work without pain and recommended that he confine his future activities to light work and supervision.

Brannan, at the time of the trial, was 53 years of age. His life-work was that of a mechanic, baseball player, and boxer. Prior to this accident he had cut an artery in his left hand, broken his leg playing baseball, burned an arm in the explosion of an acetylene tank, suffered a rupture of the groin, and his left eye had been pierced by a steel sliver. Other than this he claimed that his health had always been good; that he had never experienced any pain in his left hand, arm, or leg and had experienced no difficulty in performing heavy work. He claimed that he was forced to discontinue his work as a mechanic at Pribyl Brothers Garage as a result of the injuries received in the accident; that he worked for six to eight weeks in October and November 1951 as a village constable but gave it up partly because of his disability. From July 8, 1951, to May 11, 1953, he claimed that his earnings were not in excess of $1,000 and contended that up to the time of the trial he had sustained $3,800 loss of earnings. Special damages primarily for his medical and hospital expense were $1,100.24.

Admissions made by Brannan in cross-examination tended to discredit some of his testimony and some of it was directly im-

peached by the testimony of other witnesses. Don J. Murray testified that Brannan told him that he had been a left-handed pitcher but was required to change over to the right hand because of an accident which he had with a horse. This Brannan denied. There was also evidence that at least on one occasion after the accident Brannan performed mechanical work which he testified upon the trial he could not do. A neighbor, Chester B. Van Vliete, testified that he observed Brannan shoveling snow and digging up his septic tank using the shovel with both hands, whereas Brannan claimed that he was able to use only his right hand in shoveling and then only by placing the shovel across his body. There was evidence that he rowed a boat in normal fashion and that his physical condition was not entirely the cause of discontinuing work at the Pribyl Brothers Garage and also as a constable. From the evidence the jury could find that Brannan's claim for lost earnings was greater than the facts warranted, also that he did not suffer the amount of pain and disability which he claimed. In denying Brannan's motion for a new trial the court, in its memorandum, pointed out that evidence had been introduced by defendant to show that Brannan was not truthful in his testimony, and the court stated that, although the verdict was adequate and that it would not be compelled to disturb it, nevertheless, in the interest of substantial justice the order increasing the verdict to $7,500 should be made.

In this case subjective symptoms played an important role. Brannan's medical experts, of necessity, were required to rely, in a substantial measure, upon his complaints. The opportunity of the trial court to observe Brannan and evaluate his evidence must not be overlooked. A verdict cannot be set aside simply because this court may be of the opinion that it was not adequate. Because other juries have returned verdicts for larger amounts for similar injuries does not authorize us to interfere with the verdict. There is no fixed standard by which loss for injuries can be determined. Naturally the minds of reasonable men differ widely upon such a proposition. As pointed out in the case of Litman v. Walso, 211 Minn. 398, 1 N. W. (2d) 391, this court will not interfere with a verdict in such cases

unless the damages awarded clearly appear to be excessive or inadequate and to have been given under the influence of passion or prejudice. And whether a new trial upon the ground of excessive or inadequate damages should be granted or refused or whether the verdict should be reduced or increased rests in the sound judicial discretion of the trial court. Litman v. Walso, *supra.* Though the verdict here, even as increased by the trial court, may be low when viewed in the light of plaintiff's evidence, yet when viewed in the light of all of the evidence we are unable to say that it is so inadequate that the court abused its discretion in denying Brannan a new trial. The trial court was in a much better position than we are to pass upon the question and its action must stand.

Affirmed.

---

[1] Reported in 64 N. W. (2d) 769.